Good afternoon, Mr. Stewart. Good afternoon, Your Honor. Lauren Stewart from the Federal Community Defender Office. I represent Petitioner-Appellant Joseph Howell. I'd like to please reserve a few minutes for rebuttal. Sure. The two key issues before the court are first whether the representation of blacks on the Allegheny County jury pool is fair and reasonable in relation to the community. What's the appropriate matrix? The comparative disparity or the absolute disparity or is it a combination of both? A combination of both, Your Honor. Under this court's precedent in Weaver and I think also Ramsour v. Byer, the court should look to both. There is an abundance of case law that describes each of them. And I would submit that the court should consider them as to prong two of the standard under Durham v. Missouri. So I've got a holistic approach here. I think that's right, Your Honor. That would go as to prong two. Prong three, each prong may augur in favor or against finding the Sixth Amendment violation. But that second issue that's before the court, of course, is prong three. If the court does find under the second prong that there was underrepresentation, the court must consider whether that underrepresentation was due to the systematic exclusion of blacks in the jury pool. And the systematic exclusion is the result of the jury selection process. I would like to first address systematic exclusion. The question of underrepresentation, absolute and comparative disparity, those numbers are set forth in our brief, but I'd be happy to field questions later. Turning to systematic exclusion, systematic does not mean intentional. Systematic doesn't require a showing of bad faith. Systematic, under this court's precedent and the United States Supreme Court's decision in Durham, requires the showing of underrepresentation over a prolonged period of time. Or, as the court stated in Durham, if a petitioner makes that showing, the petitioner, quote, manifestly indicates that the cause of the underrepresentation was systematic, that is inherent in the particular jury selection process utilized, unquote. And that's at 439 U.S. 366. Here, Your Honors, there is abundant evidence of systematic exclusion. Specifically, in the years leading up to Mr. Howell's trial, the press documented the exclusion of blacks in the jury pool in Allegheny County. The legislature was conducting a study responsive to the exclusion of blacks in the jury pool. The Pennsylvania Supreme Court conducted a study. Mr. Howell, in his pre-trial motion, offered unrebutted statistical evidence from an expert that showed over 50 percent underrepresentation of blacks. And then, we also know from the time of trial in this case that some judges on the Allegheny County Court of Common Pleas were themselves overriding the jury selection process. What I mean by that is that at least two judges in the record, Judge Matchin and Judge Nahaus, I may be mispronouncing their names, each of them were allowing defendants to select from multiple jury panels. They were allowing them to go back day after day until counsel was satisfied that there was a representative jury panel from which the defendant could select his or her jury. In this case, Mr. Howell was not permitted any such accommodation. Instead, he chose his jury panel. He had two panels, correct? That's correct, Your Honor. After all, there were two black jurors on the first panel. That's correct. The first panel of 35 jurors, there were two blacks on the panel, each of whom was excused for hardship. Based on your statistics that you provided, if you brought 100 people in, based on the statistics, you'd have six black jurors. I'm sorry, Your Honor, the statistics from Mr. Howell? 5.47 or 5.74 percent. Out of 100 people, you'd have six black jurors. That would be the underrepresented amount. Yes, that's right. Whereas if it was equal to the black population in Allegheny County, the black over 18 population in Allegheny County, it would be 10. Yes, Your Honor, closer to 11, 10.7. Okay. That's right. So theoretically, in fact, in practical terms, maybe not theoretically, in your case, the two black jurors were excluded for cause of sorts. They couldn't have jury duty. Hardship per each, yes. And if you had 100 jurors, you would then only have five others out of 100. Out of 98 that would be black, out of almost, out of 100, you'd probably have maybe four or raise. If, Your Honor, the math were being done from the underrepresented sample, that's right. Well, I'm talking about under 10, if you had 10. If you had 10 out of 100. Right. And were raised, you're going to pick from eight. Oh, I understand. Yeah. So, I mean, I guess my problem with this, and I know you said that this is not intentional, systematic does not mean intentional. You know, what is a county like Allegheny County to do? You know, there are studies out there that have been done that perhaps the crux of this problem is the willful under participation by blacks in the community in the jury process. If people won't come and serve on juries, what are they to do? That's a fair question, Your Honor. I would answer a couple things. Number one, there is evidence in the record, particularly the Pittsburgh Tribune review article that was published two years before Mr. Howell's trial, that not only was there under representation, but that blacks were being summoned for jury service at a rate of half of the rate that white jurors were being summoned. That review by Mark Howser, who published the article. The summoning process starts from two lists in Allegheny County. Correct. Voter registration and driver's licenses. At the time, that's correct, Your Honor. Correct? Yes. So, where is the systematic exclusion there? It's not like Doran in the landmark case. No, that's right. The policy itself is facially neutral. But the evidence in the record, and I would commend the court to the article entitled The Jury of Peers and Mr. Howser's study, that his study analyzed 45,000 juror summons. And to speak concretely, to give an example from his study and from that article that's in the record, in his classification of different neighborhoods in Allegheny County, he classified as white neighborhoods that had, based on census data, over 98% white residents. And as black, those with over 50%. And it was shown, for example, that in the Hill District, that at the time was predominantly black, that 177 jurors were summoned in the time of the study. That in the Kennedy Township neighborhood, that at the time was predominantly white, that 356 jurors were summoned, and the population, the jury age population of the two neighborhoods were similar. But is the issue before us how to fix the problem? No, Your Honor. So the issue before us is if we send it back, what happens? Fair question, Your Honor. Under the Duran standard, of course, if this Court were to reverse the district what would then occur is that the Commonwealth would be put under the burden-shifting test, not unlike that one. Right. And the Commonwealth could, if at that time wanted to, attempt to offer, it would offer a significant state interest if it wanted to try to justify the process that was- As it existed then. As it existed then. And in response to what I think the Court might be inquiring, shortly after Mr. Howell's trial, and I think in response to the inquiries that were going on, both from the legislature and the State Supreme Court, the statute was amended. The jury selection statute, Title 42, Section 4521, and also a new statute was enacted, the same title, Section 4521.1, that created a statewide jury commission. And the point of the creation of the commission was to get a broader jury pool. This is a 2007 amendment, Your Honor. And what was created was a system under which state data, including from the Department of Public Welfare, was brought into a state jury database that then the counties could draw from. So instead of just PennDOT, instead of just voter registration, each of which have-there are social studies about those, that those are not truly reflective of the committee. We've already-we've essentially blessed them, right? Voter registration records and motor vehicle records. That's right, Your Honor. And voter registration records are also in the federal statute, right? The Jury Selection and Service Act. That's right, Your Honor. So on Prong 3 of Duren, where-what's the basis for systematic exclusion other than newspaper articles and some interests by legislative bodies? So Allegheny County needed to do more at the time. In 2002, the article was published. In 2003, the state senate and the joint government report was issued. In 2003, the state supreme court issued a report, each of which documented substantial underrepresentation. In 2004, when Mr. Howell was brought to trial on a murder charge, a black man accused of killing a white man, he asked and his counsel asked the court to be permitted a fair veneer. He asked to be permitted to choose his jury from a representative panel, a representative of the community. He was denied. Now, his case is somewhat unique. Other defendants at the time were given other panels. We also know the statute was amended. I don't believe, Your Honor, in the record of silence as to whether there are any other similarly situated defendants as to Mr. Howell. But- Can we talk about the second prong for a minute? Back to the numbers again. Absolutely. So the absolute disparity is about 5%. That's right, Your Honor. And the comparative is 50-some percent. Almost 55. So the absolute disparity is within the range of 10% or so that I think most courts find acceptable. Do you agree with that? I would disagree. Simply because there are significant minority populations that are less than 10% in the community and a court doesn't apply a strict numerical cutoff. Say, excluding an 8% minority from a jury veneer entirely would be an 8% absolute disparity. That couldn't possibly be blessed under the Sixth Amendment. I'm saying as I canvassed the cases, I found that 10% seemed to be around the figure that courts were looking at for absolute disparity. If you were within that range, you were okay. Are you disputing that just as a matter of objective fact in terms of the case law? I would commend the court to Garcia Durantes v. Warren, a Sixth Circuit case. It's in my brief. It's 801 F. 3rd 584. In that case, the absolute disparity of the black population was 3.54%. And on the prong two analysis under Durant, it was found to constitute a not fair and representative sample. Okay. And then the comparative disparity. Do you have any cases that stand for the proposition that where absolute disparity is not deemed to be problematic, but comparative disparity is, that that's sufficient to show under prong two a problem? I would submit that the cases don't present the analysis as clear hurdle number one, absolute disparity, and then surmount hurdle number two, comparative disparity. I agree. But that same case, the Garcia Durantes case, had a comparative disparity that was lower than the comparative disparity in this case, as do other cases, Preston v. Mandeville, Castaneda v. Partido, which was a U.S. Supreme Court case, and even Turner v. Fausch, another older Supreme Court case. In some of those cases, there are either overt, non-facially neutral policies or sort of non-objective jury selection policies. So there are some differences, but the numbers certainly do not preclude relief here. I see that I'm out of time for now, unless the Court has any other questions. We'll see you back shortly. Thank you. Good afternoon, Ms. Pettit. Good afternoon, Your Honor. May it please the Court, Rasheen Pettit on behalf of the appellee. I'd like to begin with addressing the preliminary issue that I think, which is whether or not the State court adjudication on this issue when it was raised on appeal was clearly contrary to or an unreasonable application of Dern v. Missouri. Because unless the appellant can meet that burden, there can be no relief under habeas review, under EDPA. Are you suggesting that the State court opinion was consistent with U.S. Supreme Court authority at the time? So, no, not exactly. Well, first of all, I think we can agree that we're not looking at clearly contrary because the material sets of facts are very easily distinguishable. The appellant's argument is that it was an unreasonable application of Dern. While absolutely concede that what the Pennsylvania court did was essentially say, we recognize you're raising this under Dern, but we're going to answer it under our own State law. Right, but include an intent element that wasn't the Supreme Court didn't include in their analysis. So they made it a more difficult burden, right? So, that is certainly one way to look at it. What other ways to look at it? They said that the Pennsylvania Supreme Court includes this intent requirement. The U.S. Supreme Court on Dern did not include that intent requirement. The argument that I think that could be made, and again, to show an unreasonable application, it's not just that Pennsylvania made a mistake. It's not that they were incorrect. It's that their ruling is so unjustifiable that it's beyond all possibility of fair-minded disagreement. And what I'm suggesting to this Court is that when you read the Dern opinion and you look at the actual language of the opinion, when the Court is addressing the third prong, systematic exclusion, it does not mention intent explicitly. That is absolutely true. What it does do instead is it looks at the jury pool process in that case. It pinpoints exactly where the exclusion occurred, and it concludes that the exclusion of women was due to the process and that they excluded and discriminated against women. And I do think that there is an argument that can be made, and it was made in the brief, that there's still room for some disagreement on that matter. I'm happy to move on to the other prong. Justice Rehnquist addressed that at the time. Yes. Attempted to address it in his dissent. Yes. But I don't think that's your strongest argument. Nor do I, but I do think that that is the initial consideration. We may not give that for definite, but we have to look at this de novo. Yes, absolutely. And decide for ourselves. And doing that, Your Honors, then we're going to look right into the whether or not he has shown the actual constitutional violation. And I'd like to pick up on the systematic prong, the third prong of that test. When we look at that, both this Court and the Supreme Court have said that in considering whether or not there was systematic exclusion, we have to look at the nature of the process of the jury pool. And as was just pointed out, the nature of the process in Allegheny County at the time, and it still is today, is that the master list comes from randomly selected individuals from voter registration, and they supplement it, even though they are not required to do so. They supplement it with driving records from PennDOT. Now, voting registration list has been approved by multiple circuits across the country. It's in the federal statute. It's how juries are pooled in this very courthouse. And not only did Allegheny County utilize that, they took it one step further, and they supplemented it with driving records. Now, the Supreme Court later in 2010 in the Smith case, they said that Taylor and Duren are two examples of what sorts of systematic defects would qualify as violations of the Sixth Amendment. And they indicated that the defendants in those cases readily demonstrated the exclusion with particularity. The appellant has not done that in this case. He hasn't even come close. And the courts have also indicated that we also have to look at the length of the time of the alleged underrepresentation. The study that the appellant is relying on, the study that was part of his record, okay, it's not the study from a Tribune Review article. I want to point that out. Okay, that's not in evidence here. No, it's a professor. I get that, right? Yes, Professor Carnes. How many months was that study? Six months, Your Honor. How long was the study in Duren? In Duren, I believe it was eight months. But the study that Mr. Dr. Carnes, I believe he went by, undertook was six months. But more importantly than that, he surveyed approximately 4,500 people. Now, the testimony at that same hearing indicated that in a given year during that time period, 100,000 questionnaires would go out to people from the master wheel, if you will, the master list. So he really was looking at a small, small subset. Not only was he not looking at the master wheel, he was looking at who was called for jury duty on any given day during that six-month period, okay? So you're talking about a subset of a subset of the master wheel. In addition to that, Dr. Carnes conceded that he didn't know if people filled out the surveys accurately. He also testified that if a certain minority group does not respond to the questionnaires, then that would skew his own figures and his own numbers. And those are things that we just don't have the answer to. And that's why his study really isn't a very reliable study and certainly doesn't give us the numbers that the appellant would need in order to make this constitutional violation argument. Excuse me. The Tribune Review article, that is not an evidence. That's also my review of that is that it focused much more on people that actually showed up for jury duty versus the jury pool. So I think that when we look at the systematic exclusion here, the problem is that he hasn't pinpointed that there was anything in the nature of Allegheny County's process that inherently excluded or discriminated against excluded people. And he hasn't shown that there was any – that he hasn't proven that this underrepresentation allegedly took place over a substantial length of time. So let me ask you. So to make out, hypothetically speaking, to make out a prima facie Sixth Amendment cross – fair cross-section claim in Allegheny County, what would the numbers have to look like? So now you're referring to, like, prong two? What were the numbers? Well, I think that there is no answer to that question because there has not been a bright-line rule by the Supreme Court and even by this Court. Do you agree with me that 10 percent is a fair range? Yes. Or do you disagree? Well, I would agree. And I would also note that this Court has held that I believe the range that they gave is 2 percent to 11.5 percent has not constituted substantial underrepresentation. And that was in the Ramseur case. And in Ramseur we said 40 percent for comparative disparity is borderline. So how do you characterize the 50-some percent in this case? I believe in Ramseur we said that – this Court said that 14.1 percent absolute disparity would be considered borderline. And the comparative disparity, I don't recall. You're saying that – Ramseur, we have 54.49. Well, I would – I think the problem with comparative disparity, and this has been pointed out by this Court as well as the Supreme Court, is that when you're looking at a population that is not – that is a smaller population when looking at the population as a whole, that any distortion is going to be exaggerated. And that's why the comparative disparity method has been criticized a lot of times. And while I understand that the appellant's position is that African Americans make up a large minority, that is true, but it's still not a large population. By the census numbers, it was still a 10 percent population. So I don't think the comparative disparity method is the best method to look at in this case. So to answer your question, I don't think that there is a magical number that I can present to you and say this is what he would have to show. But I do think that looking at this Court's own decisions, it's – again, there's not a bright light in rule. But this Court has indicated that his numbers are simply not going to be enough to meet his burden, and that's what the district court found as well. I really think, though, that the – the fact is I don't believe that the appellant has met his burden under either prong two or prong three. And one thing that I would like to address, and I think it goes more to the second prong and why his numbers and statistics should not be really that reliable in this case, but in a way it really taints the whole matter, and that is the fact that Dr. Carnes' test doesn't produce strong evidence. And we know that when looking at prong two, the Court is supposed to consider the strength of the statistical evidence that's been presented. Dr. Carnes only studied the 4,500 people that showed up for jury duty during a six-month period. Now, the way jury duty works, and this is part of the record, is that on any given day certain groups are called for their number. So these are the groups of people who were called in that day. He does not account for the master list, which this Court in Weaver said that undermines the strength of any statistical evidence. He does not account for the racial makeup of the individuals who received over 100,000 questionnaires. He does not account for the racial makeup or make any effort to account for the racial makeup of the 41% of individuals who just did not return the questionnaire. So I think really this isn't a matter of the 4,500 people not being enough people. It's not the size. It's actually the sample itself and the sample that he looked at. And as I indicated, this Court in Weaver found that the expert in that case, that his statistical evidence was the language that was used was far too weak. And when they made that conclusion, they were referring to the fact that he did not analyze the unreturned questionnaires. And they said he should have accounted for the statistical impact of the unreturned questionnaires. So while in that case the expert also made a mistake of misrepresenting what he had done, he represented that he had looked at the master wheel when he had not. And that was pointed out in the reply brief, and that's true. But this Court, when discussing what he did do, they made that finding very clear, that the fact that he did not account for unreturned or unresponsive individuals impacted his statistical evidence, and it did so negatively. So for those reasons, I really think that the appellant has failed to meet his burden under either prong. So while I do think that he's really failed to show that there is a constitutional violation, so just as the district court kind of skimmed over the idea of whether or not Pennsylvania had looked at Dern incorrectly and said, we're still going to deny relief because you haven't shown us the constitutional violation, I think this Court should do the same. Thank you. That's all I have. Thank you. Let me start with the deference issue. Do we give the Pennsylvania opinion any empty deference? You don't, Your Honor, for the reasons set forth in the brief. I can elaborate if the Court has specific questions. Your Honor, I can make three points in rebuttal. First, about the strength of the evidence. Dr. Carnes, in his testimony, he testified to the method of how he took the evidence. He also testified, and I would commend to the Court reading his testimony at JA 112, which is where he testified about margin of error, Z statistic, the calculations that show that a sampling of 4,500 is a relevant and accepted statistical analysis for the sample that was presented here. I would also note that the Commonwealth at trial didn't offer any expert of its own, did not meaningfully rebut the evidence, frankly. Second, I would commend to the Court as to the acceptable methods for showing underrepresentation. I addressed this in the reply brief at pages 11 to 12, but specifically just to summarize, the courts that are addressing these claims have accepted previously stipulations of parties. They've accepted studies of jurors who show up at the courthouse. They've accepted studies of the master wheel. They've accepted many different types of things, and the cases are the same that the Court has been hearing about today. Smith, Duren, Castaneda, Garcia-Durantes, Rogers, Haithman, and Chenault, set forth that the courts don't have a specific requirement, and in any event, what Mr. Howell presented here was good enough. Finally, just to close, as to prongs two and three and why this was a unique case of systematic discrimination and why there was underrepresentation, the alarm bells had sounded in Allegheny County. It was the newspaper. The legislature took notice. The Pennsylvania Supreme Court took notice. The underrepresentation was really substantial. It's not in the record, but there were other counties where there was overrepresentation of people of color. Allegheny County had a serious problem, and in two years leading up to Mr. Howell's trial, it did not do what was required under the Sixth Amendment to ameliorate that problem and give him a fair trial. With that, I would ask that you reverse the District Court's dismissal of the petition. Thank you. Thank you, Your Honor. Thank you, everybody. We'll take this under advisement and get back to you shortly.